## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRESENIUS KABI USA, LLC<br>3 Corporate Drive<br>Lake Zurich, Illinois 60047<br><br>       Plaintiff,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>CHIQUITA BROOKS-LASURE,<br>in her official capacity as Administrator of the Centers<br>for Medicare and Medicaid Services,<br>Office of the Administrator<br>7500 Security Boulevard<br>Baltimore, MD  21244<br><br>CENTERS FOR MEDICARE AND MEDICAID<br>SERVICES,<br>7500 Security Boulevard<br>Baltimore, MD  21244<br><br>XAVIER BECERRA,<br>in his official capacity as Secretary of U.S.<br>Department of Health and Human Services<br>Office of the Secretary<br>200 Independence Avenue, SW<br>Washington, DC  20201<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES<br>200 Independence Avenue, SW<br>Washington, DC  20201<br><br>       Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Fresenius Kabi USA, LLC ("Fresenius Kabi") brings this Complaint against the United

States of America, the Department of Health and Human Services ("HHS"), the Secretary of HHS

1

("Secretary"), the Centers for Medicare and Medicaid Services ("CMS"), and the Administrator of CMS (collectively, "Defendants") seeking declaratory and injunctive relief.

## INTRODUCTION

1.      In 1990, Congress enacted Section 1927 of the Social Security Act ("SSA") to establish the Medicaid Drug Rebate Program ("MDRP") and amend the outpatient prescription drug benefit, which is an essential part of the federal-state Medicaid health insurance program administered by CMS.  Section 1927 requires participating drug manufacturers to pay quarterly rebates to state Medicaid agencies based on the quantity of eligible outpatient drug prescriptions each state Medicaid agency reimburses in a given quarter for the manufacturers' drugs.

2.      Section 1927 provides for a higher percentage per-drug rebate for "innovator" drugs, and a lower percentage per-drug rebate for "non-innovator" drugs.  The proper classification of a prescription drug as "innovator" or "non-innovator" thus has a financial impact on the magnitude of rebates owed by participating drug manufacturers.

3.      Plaintiff Fresenius Kabi is a global health care company that specializes in injectable medicines, biosimilars, and technologies for infusion, transfusion, and clinical nutrition. Fresenius Kabi participates in the Medicaid program.  As relevant here, CMS has classified a number of Fresenius Kabi's generic drugs as "innovator" drugs rather than "non-innovator" drugs for purposes of the MDRP for the period prior to April 1, 2016.  The generic drugs at issue in this lawsuit are:

(i)      Heparin sodium injection (New Drug Application ("NDA") 017029);

(ii)     Heparin sodium injection (NDA 017651);

(iii)    Oxytocin injection (NDA 018248);

(iv)     Furosemide injection (NDA 018902);

(v)      Magnesium sulfate injection (NDA 019316); and

(vi)    Neostigmine methylsulfate injection (NDA 203629).

As a result of the erroneous classification, Fresenius Kabi has been subject to rebate claims from state Medicaid programs that are higher than they should have been if these generic drugs had been correctly classified as "non-innovator" drugs.

4.      Each of the generic drugs at issue should be classified as a non-innovator drug. Each of the NDAs identified above was submitted to the Food and Drug Administration ("FDA") to obtain approval to market a duplicate of a drug substance that had long been marketed in the United States by other manufacturers.  Under the plain language of Section 1927, none of these generic drugs was "originally approved under an original [NDA]," and none is an "innovator" drug subject to higher rebate obligations.  Rather, the Fresenius Kabi drugs at issue are "follow-on" or "duplicate" or "generic" versions of established prescription drugs that had been marketed in the United States *before* the NDAs were filed.

5.      In February 2016, CMS issued a final rule purporting to interpret the statutory phrase "original new drug application" to encompass any and all NDAs, regardless of whether the application had been submitted for a generic drug.  *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5190-91 (Feb. 1, 2016).  CMS declared that the manufacturers of generic drugs covered by NDAs, including drugs that had been historically classified as "non-innovator," would have to reclassify their products as "innovator" unless a "narrow exception" applied.  *Id.* at 5192.

6.      In November 2016, Fresenius Kabi sought relief from CMS with respect to the proper classification of the drugs at issue in this case and other prescription drugs.  On January 4, 2021, June 9, 2021, February 7, 2024, and February 27, 2024, CMS agreed that each of the generic drugs identified above should be classified as a non-innovator multiple source drug subject to the

lower rebate rate under Section 1927.  CMS, however, limited those decisions to the period beginning on April 1, 2016 (the effective date of the CMS final rule).  CMS further declared that some of the drugs in question were misclassified through March 31, 2016, and must be reported as innovator drugs for the history of the drug's participation in the MDRP through March 31, 2016.

7.      CMS's denial of non-innovator status for the Fresenius Kabi drugs at issue for the period prior to April 1, 2016, is contrary to the governing MDRP statute.  Under Section 1927, these drugs are non-innovator drugs because they are generics that were not "*originally* marketed under an *original* new drug application approved by the Food and Drug Administration." 42 U.S.C. § 1396r-8(k)(7)(A)(ii) (2012) (emphasis added).  That conclusion is confirmed by the decision in *STI Pharma, LLC v. Azar*, 613 F. Supp. 3d 152 (D.D.C. 2020), which held that CMS acted contrary to law when it denied non-innovator status for another manufacturer's drug for the period prior to April 1, 2016.  *STI Pharma* held that direct application of the statute dictated non-innovator status for "follow-on" or "generic" versions of "pioneer" or "innovator" drugs prior to the April 1, 2016 effective date of CMS's regulation.  *Id.* at 167, 169.[1]  The same result is warranted in this case.

8.      Fresenius Kabi brings this lawsuit to compel CMS to (i) recognize that the Fresenius Kabi drugs at issue are properly classified as "non-innovator" drugs prior to April 1, 2016, and (ii) permit Fresenius Kabi to implement the requested correction of the status of its non-innovator drugs for the periods prior to April 1, 2016.

---

[1] CMS did not appeal the decision in *STI Pharma*, but has nevertheless declined to follow it in its treatment of the Fresenius Kabi prescription drugs at issue here.

## THE PARTIES

9.      Fresenius Kabi is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 3 Corporate Drive, Lake Zurich, Illinois.  As noted, Fresenius Kabi is a global health care company that specializes in injectable medicines, biosimilars, and technologies for infusion, transfusion, and clinical nutrition.  The majority of its drug portfolio consists of non-innovator multiple source drugs, including the drugs at issue in this case.

10.      Invenex Laboratories ("Invenex") was a generic drug manufacturer active from at least the 1960s through 1985. Invenex filed five of the six NDAs at issue here (for heparin sodium, oxytocin, furosemide, and magnesium sulfate) between 1971 and 1984.  In 1985, Invenex was acquired by a company called LyphoMed, Inc. ("Lyphomed").  In 1989, Fujisawa Pharmaceutical Company ("Fujisawa") purchased LyphoMed.  In 1998, American Pharmaceutical Partners, Inc. ("APP") acquired Fujisawa's multi-source pharmaceutical business (including the above generic drugs).  In 2007, APP's parent company split into two independent, publicly traded companies, Abraxis BioScience LLC and APP Pharmaceuticals, LLC, with the latter retaining APP's multi-source pharmaceutical business (including the above generic drugs).  In 2008, Fresenius Kabi acquired APP Pharmaceuticals, LLC.  Fresenius Kabi filed the sixth NDA at issue (for neostigmine methylsulfate) in 2011.

11.      Defendant HHS is an executive department of the United States Government. HHS's headquarters are located at 200 Independence Ave., S.W., Washington, D.C.  20201.

12.      Defendant Xavier Becerra is named in his official capacity as Secretary of HHS, in whom is vested the authority by statute to implement the requirements of the Social Security Act,

including the MDRP.[2]  Defendant Becerra maintains his office at 200 Independence Ave., S.W., Washington, D.C. 20201.  He is being sued in his official capacity only.

13.     Defendant CMS is an agency of the United States Government within HHS.  Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.

14.     Defendant Chiquita Brooks-LaSure is named in her official capacity as Administrator of CMS, to whom HHS has delegated authority to implement certain requirements of the Social Security Act, including the MDRP.  Defendant Brooks-LaSure maintains her office at 7500 Security Boulevard, Baltimore, MD 21244.  She is being sued in her official capacity only.

## JURISDICTION AND VENUE

15.     Plaintiff Fresenius Kabi's action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, *et seq*., and the Social Security Act.  *See* 42 U.S.C. § 1396r-8.

16.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1361 (action to compel federal officer to perform his or her duty).

17.     The Court has authority to grant the relief requested by Fresenius Kabi pursuant to the APA, 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

18.     There exists between the parties an actual controversy, justiciable in nature, wherein Plaintiff seeks a declaration of its rights by this Court and injunctive relief.

---

[2] Title 5, Section 702 of the United States Code provides that "the United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." 5 U.S.C. § 702.

19.     Venue is proper in this district under 28 U.S.C. § 1391(e) because one or more Defendants reside in this judicial district.

20.     Defendants' refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016 is final agency action.  *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

21.     Fresenius Kabi has standing to bring this lawsuit because it has been harmed by Defendants' refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016.  *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379–80 (D.C. Cir. 2021); *Airlines for Am. v. TSA*, 780 F.3d 409, 410–11 (D.C. Cir. 2015).  That harm includes, but is not limited to, liability for increased rebates for drugs misclassified as innovator drugs.  If Fresenius Kabi prevails, CMS will allow Fresenius Kabi to treat the drugs at issue as non-innovator drugs for the period prior to April 1, 2016, and that would allow Fresenius Kabi to realize the benefit of lower rebate amounts, thereby "creat[ing] 'a significant increase in the likelihood that [it] would obtain relief that directly redresses the injury suffered.'"  *STI Pharma*, 613 F. Supp. 3d at 163 (quoting *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 739 (D.C. Cir. 2008)).

## STATUTORY AND REGULATORY BACKGROUND

### A.     The New Drug Application Requirement

22.     The Federal Food, Drug and Cosmetic Act of 1938 ("1938 FDCA"), Pub. L. No. 75-17, § 505(a)-(d), 52 Stat. 1040, 1052, prohibited interstate distribution of a "new drug" unless a new drug application ("NDA") was "effective" for "such drug."  *Id.* § 505(a).[3]  Under the 1938

---

[3] The Complaint refers to provisions of the FDCA by their FDCA section numbers rather than their location in the U.S. Code.  (For example, "section 505" refers to 21 U.S.C. § 355).

FDCA, an NDA submitted to FDA became effective, automatically, on the sixtieth day after filing, unless FDA took action to block the application.  FDA could deny an NDA based on a failure to show that the new drug was safe for its intended use, *id.* § 505(d), but there was no obligation for an applicant to show that the new drug was effective.

23.     In 1962, Congress enacted the Kefauver-Harris Drug Amendments of 1962.  Pub. L. No. 87-781, § 102, 76 Stat. 780, 781 ("1962 Amendments").  Under the 1962 Amendments (and still today), a new drug cannot be introduced unless an NDA for that drug has been affirmatively approved by FDA.  *See* 21 U.S.C. § 355(a).  Such approval requires a finding that the sponsor has demonstrated through substantial evidence (defined as one or more adequate and well-controlled clinical trials by qualified experts) that the drug will be effective for the uses claimed in its labeling. *See id.* § 355(c), (d).

24.     The 1962 Amendments included transitional provisions addressing NDAs that had taken effect under the 1938 FDCA.  Under the 1962 Amendments, those NDAs were "deemed … approved" and given a two-year grace period to provide substantial evidence of their efficacy. Pub. L. No. 87-781, § 107(c)(2), 76 Stat. at 788.  After that time, FDA was directed to withdraw any NDA lacking substantial evidence of efficacy.  *See id.* § 107(c)(3)(B).

25.     To implement this efficacy requirement, FDA partnered with the National Academy of Sciences/National Research Council to review efficacy claims made in the labeling of thousands of drugs covered by NDAs that had been deemed approved under the transitional provisions of the 1962 Amendments.  *See* 31 Fed. Reg. 9426 (July 9, 1966).  That effort became known as the Drug Efficacy Study Implementation ("DESI") program.

26.     As a result of the 1962 Amendments, FDA was required to modernize its regulation of "follow-on" or "generic" drugs.  In the early 1940s, FDA had adopted "a policy of declining to

accept NDAs for generic versions of products under the theory that the drugs had become generally recognized as safe during the period of marketing of the pioneer NDA's products." *See* Statement of Dr. Marion Finkel, Director, Bureau of Drugs, FDA, Dkt No. 79-P-0484/PSA, ¶ 32 (Dec. 1, 1980) ("Finkel Statement").  FDA separately issued thousands of "old drug" letters authorizing the sale of drugs that were "identical, related, or similar" to a pioneer drug "when one or more NDAs were already effective."  40 Fed. Reg. 26142, 26143 (June 20, 1975).  By 1969, FDA estimated that for each "effective NDA" for a pioneer drug, "there were five" generic drugs marketed without FDA approval.  *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 624 (1973).

27.     The 1962 Amendments called those practices into question because they required a showing of substantial evidence of effectiveness for *every* drug.  *See* 40 Fed. Reg. at 26144 (noting "the mandate of the 1962 Amendments to apply the requirements of effectiveness to all identical, related, or similar products, as well as to the pioneer NDA's").

28.     Nevertheless, in 1975, FDA adopted a policy of "distinguish[ing] between those drugs which require [an approved NDA] . . . and those drugs for which such approval can be replaced with general surveillance and monitoring controls without loss of public protection." *Id.* at 26147.  FDA announced that the FDCA should not be understood to require "that every human prescription drug product be the subject of an approved [application]." *Id.*  FDA's 1975 announcement was challenged in court and enjoined.  *See Hoffman-LaRoche, Inc. v. Weinberger*, 425 F. Supp. 890, 894 (D.D.C. 1975) ("FDA's policy of permitting new drugs to be marketed without an approved new drug application contravenes the clear statutory requirement of preclearance[.]").  Subsequently, the Supreme Court confirmed that each marketed drug product,

including generic drugs, requires its own approved new drug application. *See United States v. Generix Drug Corp.*, 460 U.S. 453, 454 (1983).

B.     **Drug Approval For Generic Drugs**

29.     After the 1962 Amendments, FDA established two special types of NDAs to ease the burden of obtaining the right to market a "follow-on," "duplicate," or "generic" drug.

30.     First, FDA adopted a regulation allowing "abbreviated" NDAs to be submitted for certain drug substances. *See* 34 Fed. Reg. 2673 (Feb. 27, 1969) (proposed rule); 35 Fed. Reg. 6574 (Apr. 24, 1970) (final rule). Abbreviated NDAs could only be submitted when FDA had made, and published, a specific finding that an abbreviated application was appropriate to support approval for the particular drug substance. *See* 35 Fed. Reg. at 6575.[4]

31.     Second, FDA recognized that the safety and efficacy of some drugs was so clearly established that an NDA could rely on published reports rather than require new clinical trials.[5] These literature-based NDAs became routine for generic drugs.[6] Literature-based NDAs were

---

[4] Such findings were made only for drugs that had been covered by effective NDAs prior to 1962. *See, e.g.*, 35 Fed. Reg. 11273 (July 14, 1970). FDA subsequently amended the regulation to limit the use of abbreviated NDAs to generic versions of pre-1962 drugs that FDA had found to be effective through the DESI program. *See* 43 Fed. Reg. 39126, 39128 (Sept. 1, 1978) (proposed rule); 48 Fed. Reg. 2751 (Jan. 21, 1983) (final rule).

[5] *See, e.g.*, 42 Fed. Reg. 21847, 21852 (Apr. 29, 1977) ("The applicant may be able to include in its application published articles and other publicly available data and information that provide an adequate basis for the agency's making the evaluation and approvability decision required under section 505. An NDA can be approved on such a submission."); 43 Fed. Reg. 58798, 58799 (Dec. 15, 1978) (announcing that NDAs for potassium iodide could meet "the safety and efficacy requirements" of section 505 "by citing the published literature").

[6] *See Hoffmann-La Roche, Inc. v. Harris*, 484 F. Supp. 58, 60 (D.D.C. 1979) (noting that FDA had approved "thousands of applications" since 1963 "in reliance primarily upon published reports"); *see also* 45 Fed. Reg. 77807, 77807 (Nov. 24, 1980) (noting that "prospective marketers of a 'duplicate' drug product" frequently submit NDAs that "reference published studies to support claims of safety and effectiveness"); 45 Fed. Reg. 82052, 82056 (Dec. 12, 1980) ("the agency has received at least 45 literature-supported NDA's for duplicate drug products of post-1962 drugs").

often called "paper NDA[s]," 46 Fed. Reg. 27396 (May 19, 1981), but also were also known as "generic drug NDAs."  Finkel Statement ¶ 33.

32.    "Abbreviated NDAs" and "paper NDAs" were two different types of "new drug applications" described in Section 505(b) of the FDCA.  Neither was understood as a separate approval pathway.[7]

33.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Amendments").  The Hatch-Waxman Amendments expanded Section 505 of the FDCA to contain three distinct approval pathways.  *See* 21 U.S.C. § 355(b)(1), (b)(2), (j).

34.    The first NDA approval pathway is reflected in Section 505(b)(1).  *See* 21 U.S.C. § 355(b)(1).  An NDA submitted under Section 505(b)(1) requires the applicant to conduct (or obtain a right to reference) *all* of the studies contained in the application to show that the drug is safe and effective.  Most "innovator" or "pioneer" drugs are approved pursuant to Section 505(b)(1).

35.    The second NDA approval pathway applies if the NDA relies on evidence of safety or efficacy *other than* studies conducted by the applicant (or to which the applicant has a right of reference).  That other evidence can include published literature or FDA's previous approval of an

---

[7] *See, e.g.*, 42 Fed. Reg. at 21851 ("[A]n ANDA is a new drug application; it represents a form of application in which certain information normally part of an NDA is not required because it is not essential to the agency's reaching a decision on the approvability of the drug product under Section 505. This information requirement is waived because the agency already has sufficient publicly available data and information in its files to make appropriate conclusions on those elements of the drug approval decision. … Generally the information allowed to be omitted relates to preclinical and clinical studies regarding the safety and effectiveness of the active ingredients."); 45 Fed. Reg. at 82054 (explaining that published literature can satisfy the NDA content requirements of Section 505(b) of the FDCA, as well as the substantial evidence of effectiveness requirement of Section 505(d)).

identical, related, or similar drug (a "listed drug"). This second pathway is subject to additional requirements set out in section 505(b)(2) of the FDCA (mainly patent certification requirements that exist to protect the intellectual property of the sponsor of the listed drug) and is commonly called a "505(b)(2) application." 21 U.S.C. § 355(b)(2).

36.    The third NDA approval pathway is an abbreviated new drug application ("ANDA") filed pursuant to Section 505(j) of the FDCA. An ANDA does not require a showing that the proposed drug is safe and effective. Instead, an ANDA must show that the proposed drug is ***the same as*** a "listed drug" in terms of active ingredient, dosage form, strength, route of administration, labeling, quality, performance characteristics, and intended use. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(v). That showing allows FDA to conclude that the generic is equivalent to the listed drug and to ***infer*** that it will be safe and effective.[8]

37.    Since 1984, most "follow-on" or "generic" drugs have been approved pursuant to ANDAs. Indeed, the word "generic" has come to refer primarily to drugs that have been approved under Section 505(j) of the FDCA. *See* Richard J. Smith, *Hatch-Waxman 2003 - Patented v. Generic Drugs*, 20 Santa Clara Comput. & High Tech L.J. 695, 699 (2004).

38.    Nevertheless, there remain many situations in which FDA's approval for a "generic" drug may (or must) have been obtained through an NDA. These situations include:

(i)  All of the numerous NDAs filed for generic drugs prior to the 1984 Hatch-Waxman Amendments;[9]

---

[8] *See* FDA, *Guidance for Industry: Determining Whether to Submit an ANDA or a 505(b)(2) Application*, at 5 (May 2019), https://bit.ly/3v4gP5j (last visited Jan. 29, 2024) ("ANDA Guidance").

[9] The Hatch-Waxman Amendments did not cause FDA to revisit any generic approvals from before 1984. Many present-day generics are marketed pursuant to NDAs approved prior to 1984, including three generic drugs at issue in this litigation (heparin sodium injection (NDA 017029 and NDA 017651), oxytocin injection (NDA 018248), and furosemide injection (NDA 018902)).

(ii) Instances when more than one manufacturer sought approval at the same time for the same drug substance pursuant to 505(b)(2) applications;[10]

(iii) Any drug that is an injectable marketed in a plastic container;[11]

(iv) A generic version of a listed drug that is administered as an injectable, ophthalmic, otic, topical, or nasal product that makes a change in certain inactive ingredients;[12]

(v) A generic version of a listed drug that contains a complex active ingredient (*e.g.*, drugs with known bioavailability issues or products that are derived from animal tissue);[13]

---

[10] When one Section 505(b)(2) application wins the race for approval, FDA does not require the sponsor of the second application to resubmit as an ANDA even if the second product is a "duplicate" of the first and would be eligible for approval pursuant to an ANDA.  *See* ANDA Guidance at 5.  That occurred for the neostigmine methylsulfate injection (NDA 203629) at issue in this litigation.

[11] Because plastic presents additional safety concerns (*e.g.,* complex organic compounds could "leach" from the plastic container into the liquid to be injected into the patient), FDA long ago established a special rule holding that an injectable drug in a plastic container requires an approved NDA.  *See* 43 Fed. Reg. 58557, 58562 (Dec. 15, 1978).  That rule remains in place today.  *See* 21 C.F.R. §§ 310.502(a)(10), 310.509(a).  The NDA for magnesium sulfate injection (NDA 019316) at issue in this litigation was submitted according to that policy.

[12] The Hatch-Waxman Amendments **do *not*** require generic drugs approved by ANDAs to have the same excipients (also known as inactive ingredients) as the listed drug.  *See, e.g.*, FDA, *Generic Drugs: Questions and Answers* (Mar. 16, 2021), https://bit.ly/48sKi7f; *see also* ANDA Guidance at 2 n.6 (FDA defines the term "duplicate" to mean a "drug product that has the same ***active*** ingredient(s), dosage form, strength, route of administration, and conditions of use as a listed drug") (emphasis added).  However, the inactive ingredients in injectable, ophthalmic, otic, topical, and nasal drugs present elevated safety concerns because such drugs bypass the natural defenses of the gastrointestinal system.  In light of those concerns, FDA regulations hold that generic drugs making certain types of excipient changes to these types of listed drugs may not be eligible for the ANDA pathway and may require 505(b)(2) applications even if they are duplicates of the listed drug.  *See* 21 C.F.R. § 314.94(a)(9)(iii)-(v).

[13] *See, e.g.*, 505(b)(2) Guidance at 5-6.  Although concerns about complex active ingredients have declined as technology has advanced, FDA continues to maintain a list of complex drug substances for which a generic applicant may have to submit a 505(b)(2) application.  *See* FDA, *Prescription List of Off-Patent, Off-Exclusivity Drugs without an Approved Generic*, RX List Part II, https://bit.ly/3RrkPUQ (last visited Jan. 27 2024).

(vi) Minor formulation changes;[14] and

(vii) Bundled applications.[15]

**C.      The Medicaid Drug Rebate Program ("MDRP")**

39.     In 1990, Congress adopted the Medicaid Drug Rebate Program ("MDRP").  *See* Omnibus Reconciliation Act, Pub. L. No. 101-508, § 4401(a)(3), 104 Stat. 1388, 1388-143 (1990). Congress did so "to offset Medicaid costs incurred by the federal government and the states for outpatient drugs provided to Medicaid recipients."  *Council on Radionuclides & Radiopharmaceuticals, Inc. v. Azar*, No. 18-633 (RBW), 2019 WL 5960142, at *2 (D.D.C. Nov. 13, 2019); *see Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 114 (2011).

40.     Section 1927 of the MDRP statute provides that drug manufacturers must enter into rebate agreements with HHS and agree to pay rebates to the states to receive state Medicaid payments for covered outpatient drugs.  42 U.S.C. § 1396r-8(a)(1).

41.     Section 1927 of the MDRP statute also sets forth the terms for such rebate agreements.  *Id*. § 1396r-8(b); *see also Pharm. Rsch. & Mfrs. v. Walsh*, 538 U.S. 644, 652 (2003). The statute establishes rebate rates for three different categories of drugs: (1) single source, (2) innovator multiple source, and (3) non-innovator multiple source.  *See* 42 U.S.C. § 1396r-8(c)(1), (3); *id*. § 1396r-8(k)(7)(A).

42.     The MDRP statute requires drug manufacturers to pay a higher rebate rate to states for drugs falling into the first category (single source) and second category (innovator multiple

---

[14] For instance, when a manufacturer seeks approval for a generic that differs from the listed drug in terms of strength, route of administration, or dosage form, it may submit a 505(b)(2) application even if an ANDA might also be pursued.  *See* ANDA Guidance at 4.

[15] A single NDA can obtain FDA's approval for multiple presentations of the same drug substance. When an application contains some presentations that are eligible for the ANDA pathway but others that are not, the applicant may bundle them together in a single 505(b)(2) application.  *See* ANDA Guidance at 6.

source) than for those falling into the third category (non-innovator multiple source).  *Compare* 42 U.S.C. § 1396r-8(c)(1) & (2) *with id.* § 1396r-8(c)(3); *see also* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5196 (Feb. 1, 2016) ("The statute requires a different rebate formula for single source and innovator multiple source drugs, which results in higher rebates owed for those drugs than for noninnovator multiple source drugs.").

43.     Drug manufacturers are required to self-report to CMS regarding the proper classification of the covered drugs that they market.  *See* 42 U.S.C. § 1396r-8(b)(3).

44.     Under the pre-2019 version of the statute in effect at all times relevant here, a "single source drug" was defined as "a covered outpatient drug which is produced or distributed under ***an original*** new drug application approved by the Food and Drug Administration." 42 U.S.C. § 1396r-8(k)(7)(A)(iv) (2012) (emphasis added).

45.     A "multiple source drug" was defined as "a covered outpatient drug . . . for which there [is] at least 1 other drug product which—(I) is rated as therapeutically equivalent . . . (II) . . . is pharmaceutically equivalent and bioequivalent . . . and (III) is sold or marketed in the United States during the period." *Id*. § 1396r-8(k)(7)(A)(i).

46.     An "innovator multiple source" drug was defined as "a multiple source drug that was ***originally*** marketed under an ***original new drug application*** approved by the Food and Drug Administration." *Id*. § 1396r-8(k)(7)(A)(ii) (emphases added).

47.     Finally, a "noninnovator multiple source" drug was defined as "a multiple source drug that is not an innovator multiple source drug." *Id*. § 1396r-8(k)(7)(A)(iii).

48.     All of the drugs at issue here (*i.e*., drugs which CMS agreed are properly classified as non-innovator multiple source drugs, but not for the period prior to April 1, 2016) are subject

to the pre-2019 version of statute—which went unchanged in relevant respects from its enactment in 1990 until the 2019 amendments.  *See STI Pharma*, 613 F. Supp. 3d at 158.[16]

> **D.     CMS's Narrow Exception Regulation**

49.     The agencies responsible for interpreting and administering the MDRP statute have issued numerous notices of proposed rulemakings and final rules construing the MDRP statute and its drug categories.

50.     In 1995, the Health Care Financing Administration ("HCFA"), CMS's predecessor agency, published a proposed rule to implement the MDRP.  HCFA acknowledged that no relevant statute "define[s] the term 'original NDA,'" as that term was used in the definitions of "single source" and "innovator multiple source" drugs.  *See* Medicaid Program; Payment for Covered Outpatient Drugs Under Drug Rebate Agreements with Manufacturers, 60 Fed. Reg. 48442, 48453 (Sept. 19, 1995) (proposed rule).

51.     HCFA proposed to "interpret [the term] to comport with [the agency's] understanding of the intent of the Congress" and, thus, to mean an "FDA-approved drug or biological application that received one or more forms of patent protection . . . or marketing exclusivity rights granted by the FDA."  *Id.*

52.     HCFA's notice of proposed rulemaking explained the two-tiered system of rebates reflected in Section 1927.  HCFA first noted that the statute "requires larger rebates for single

---

[16] Congress amended the MDRP in 2019.  *See* Medicaid Services Investment and Accountability Act of 2019, Pub. L. No. 116-16, § 6(c), 133 Stat. 852, 863.  Congress changed the definition of "innovator multiple source drug" from its pre-2019 definition of "a multiple source drug that was ***originally*** marketed under an ***original*** new drug application approved by the Food and Drug Administration" by striking the words "originally" and "original." As a result, the definition since 2019 now reads: "a multiple source drug that is marketed under a new drug application approved by the Food & Drug Administration, unless the Secretary determines that a narrow exception applies (as described in section 447.502 of title 42, Code of Federal Regulations (or any successor regulation))."

source and innovator multiple source drugs," and therefore concluded that "the term 'original NDA' was included in [§§] 1927(k)(7)(A)(ii) and (iv) of the Act for the purposes of extracting larger rebates from those products that received some form of patent or marketing protection for a specific period of time . . . than [from] noninnovators that produce generic drugs with no market protection." *Id.* ("We believe the term 'original NDA,' as proposed above, produces this effect.").

53.     The proposed rule also would have defined a "noninnovator multiple source" drug to include "[a]ll products approved under an abbreviated new drug application, [or a] paper new drug application under the FDA's former 'Paper NDA' policy, or an application under section 505(b)(2) of the [FDCA]." *Id*. at 48482.

54.     These proposed definitions remained pending until 2007, when CMS published a final rule that addressed the definition of an "innovator multiple source" drug.  The 2007 rule mirrored the statutory language in defining the term "single source drug" to mean a drug "produced or distributed under an original NDA approved by the FDA."  Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39142, 39240 (July 17, 2007).  CMS defined "innovator multiple source drug" to mean "a multiple source drug that was originally marketed under an original [NDA]." *Id*.  The 2007 rule also defined "noninnovator multiple source drug" to include drugs "marketed under an [ANDA]" and drugs "that entered the market before 1962 marketed [and were] not originally marketed under an original NDA." *Id* at 39163.

55.     Unlike the 1995 proposal, the 2007 rule (i) no longer included products that were approved pursuant to paper NDAs or 505(b)(2) applications in the definition of "noninnovator multiple source drug," and (ii) did not include a definition of "original NDA." Instead, CMS took the position that the word "original" was a nullity, such that every "NDA" should be considered an "original NDA." *See id*. at 39163.  CMS stated:  "We do not see the need to add a definition of

NDA in this final rule.  Further, the FDA does not make a distinction between an NDA and an original NDA; therefore, we view these terms as having the same meaning."  *Id*.

56.     In February 2012, CMS published a proposed rule in which it acknowledged that "questions have arisen regarding whether an 'original NDA' is the same as an NDA and whether the drug category may be different if a drug is approved under an NDA."  Medicaid Program; Covered Outpatient Drugs, 77 Fed. Reg. 5318, 5323 (Feb. 2, 2012).

57.     CMS reiterated its position that every NDA is an original NDA.  *See id.*  ("[A]n original NDA is equivalent to an NDA filed by the manufacturer for approval under section 505 of the [FDCA] for purposes of approval by the FDA for safety and effectiveness").  CMS proposed to delete the word "original" from its regulatory definition, notwithstanding that "original" was in the definition adopted by Congress.  *See id*. at 5323 ("[W]e are also proposing to use the term 'NDA' when addressing such application types for brand name drugs and ***not use the term 'original NDA'*** when referring to such drugs.") (emphasis added); *see also id.* at 5359-61.

58.     CMS finalized the current regulation in February 2016.  *See* Medicaid Program; Covered Outpatient Drugs, 81 Fed. Reg. 5170, 5190 (Feb. 1, 2016).  CMS summarized comments that had taken issue with its stated intention to read "original NDA" as the equivalent of "NDA." Those commenters had reasoned that "CMS has no authority to read out any word from the statute," especially when the term "'original new drug application' is unique to section 1927(k)(7)(A)," and is used "to clarify the distinction Congress made between innovator and generic drugs." *Id*. at 5190-91.  Commenters also explained that if Congress had wanted to simply distinguish between ANDAs and NDAs, it "would have used only those terms, like [it] did elsewhere."  *Id*. at 5191.  Other commenters highlighted the agency's decision to equate "original NDA" and "NDA" was irrational because it ignored "the circumstances surrounding the approval"

and "the changing history of FDA's approval process." *Id*. at 5190-91. Commenters further showed that CMS had no reasonable basis to force "manufacturers of certain 'generics' [to] pay higher rebates only because they were approved under an NDA." *Id*. at 5191.

59.     In response, CMS reiterated its position that "'original NDA' is designed typically to mean an NDA (including an NDA filed under [§] 505(b)(1) or (2) of the [FDCA])." *Id*.

60.     At the same time, however, CMS acknowledged what it called "very narrow exceptions" to its position that every NDA should be considered an "original NDA."

> There may be very limited circumstances where, for the purposes of the [MDRP], certain drugs might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug. For example, certain parenteral drugs in plastic immediate containers, for which FDA required that an NDA be filed, might be more appropriately treated, for purposes of the MDR program, as if they are marketed under an ANDA and classified as a noninnovator multiple source drug. Likewise, certain drugs approved under a paper NDA prior to the enactment of the Hatch-Waxman Amendments of 1984 or under certain types of literature-based 505(b)(2) NDA approvals after the Hatch-Waxman Amendments of 1984 might be more appropriately treated as if they were approved under an ANDA and classified as a noninnovator multiple source drug, depending on the unique facts and circumstances of the particular situation.

*Id*.

61.     CMS stated that it would issue "guidance on the scope of these very limited circumstances in the future." *Id*. CMS emphasized that "the narrow exception will not be considered applicable to drugs marketed under NDAs that were not approved under either the paper NDA process prior to 1984 or under certain types of literature-based 505(b)(2) approvals, or for drugs that received patent protection or statutory exclusivity." *Id*.

62.     On May 2, 2016, CMS circulated a Medicaid Rebate Program Notice for Participating Drug Manufacturers (Release No. 98), which addressed the "narrow exceptions" in in 42 C.F.R. 447.502. The Notice stated that the narrow exception provision was designed "to

ensure that drugs that are or were required to be marketed under an original new drug application for technical reasons" would not be erroneously classified as innovative.

63.     The Notice identified three "examples of drugs with NDA approvals which might be more appropriately treated as if they were approved under an ANDA and classified as noninnovator multiple source drugs." The examples were the same ones identified in the preamble to the final rule: (1) injectable drugs in plastic containers for which FDA required an NDA; (2) drugs approved under paper NDAs prior to 1984; and (3) drugs approved pursuant to literature-based 505(b)(2) applications. The Notice also stated that a narrow exception would not be granted to any drug that "received patent protection or statutory exclusivity."

64.     The Notice stated that the narrow exception analysis would apply to the "NDA at issue" and not "the active ingredient in the drug." The Notice identified several categories of information that CMS believed would be relevant to its analysis, including (i) FDA materials related to the NDA; (ii) information about patent protection or market exclusivity; (iii) information about any listed drug on which the NDA may have relied; and (iv) information about other relevant drugs, including any therapeutic equivalents.

## FACTUAL BACKGROUND

### A.     Fresenius Kabi's Requests for Classification of Certain Drugs

65.     On November 22, 2016, Fresenius Kabi submitted requests (which it subsequently updated and supplemented), that certain of its drugs should be classified as non-innovator multiple source drugs for purposes of the MDRP.

66.     Fresenius Kabi requested that CMS "confirm that the drugs discussed herein are not 'original NDAs' for purposes of the Medicare Drug Rebate Program ('MDRP')." Fresenius Kabi, Request for Exception Consideration at 1 (Nov. 22, 2016) ("FK Request I"); *see also* Fresenius Kabi, Request for Exception Consideration at 1 (Jan. 23, 2020) ("FK Request II").

67.     Fresenius Kabi explained that "the plain language of the term 'original NDA,' as used in Section 1927(k)(7)(A) of the Social Security Act, limits those drugs that are required to result in innovator rebates to the first such drug approved for the active ingredient."  FK Request II at 1 n.1 (citing Fresenius Kabi USA, LLC, Comments to Docket CMS-2345-FC (Apr. 1, 2016) ("FK Comments")).  Fresenius Kabi explained that "consistent with the statutory language and Congressional intent, the following NDAs are non-innovator drugs:"  (i) paper-based NDAs; (ii) literature-based 505(b)(2) NDAs, (iii) DESI "me-too" approvals; (iv) follow-on products; and (v) line extension products.  *Id.* at 2 & n.3 (citing FK's Comments where the "rationale is set forth more fully").[17]

68.     Fresenius Kabi's  Comments  explained  that  CMS's  decision  "to  treat  any  drug approved under a New Drug Application ('NDA') as an 'innovator' for purposes of the MDRP . . . is  contrary  to  the  plain  language  of  the  statute  and  its  reference  to  an  'original  drug application.'"  FK Comments at 1.  Fresenius Kabi further highlighted that "the statute specifically refer[s] to an 'original new drug application' when describing those drugs subject to rebate calculations at the branded rate" and "[b]y using the word 'original' as a modifying adjective to 'new drug application', Congress intended only to include the first, or 'original', new drug application, not subsequent new drug applications for the same drug, irrespective of the approval pathway, or products not approved under an NDA."  *Id.* at 2.

69.     Additionally, Fresenius Kabi highlighted that "CMS has previously interpreted the statute in effectively this manner," and that "[t]he Administrative Procedures Act does not permit a regulatory agency to disregard the plain language of a statute."  *Id.* at 2-3.

---

[17] *See also* FK Comments at 2-3 & nn.6-8 (addressing "original NDA" statutory language); *id.* at 3-4 (addressing paper-based NDAs); *id.* at 4-5 (addressing literature-based approvals); *id.* at 6 (addressing DESI "me-too" approvals); *id.* at 6-7 (addressing follow-on products).

70.     Fresenius Kabi further explained that the Final Rule "effectively eliminates the word 'original' from the statutory text." *Id.* at 3.  Fresenius Kabi thus asserted in its request that the CMS Guidance was inconsistent with the plain language of the statute, and therefore "inconsistent with the Administrative Procedures Act (APA)."  FK Request I at 1 n.1.  Fresenius Kabi also explained that even, under the CMS Guidance, "the drugs identified" in its request "are properly treated as non-innovators."  *Id.*

71.     As relevant to this lawsuit, Fresenius Kabi sought a ruling that the following drugs should be classified as non-innovator multiple source drugs: (1) heparin sodium injection (NDAs 017029 and 017651), (2) oxytocin injection, (3) furosemide injection, (4) magnesium sulfate injection, and (5) neostigmine methylsulfate injection.

72.     On May 19, 2017, Fresenius Kabi submitted FDA approval letters for each of the NDAs for these drugs.  The drugs at issue were approved by FDA as follows: (1) heparin sodium injection was approved pursuant to NDA 017029 on February 22, 1972; (2) heparin sodium injection was approved pursuant to NDA 017651 on February 10, 1978; (3) oxytocin injection was approved pursuant to NDA 018248 on July 9, 1980; (4) furosemide injection was approved pursuant to NDA 018902 on April 11, 1985; (5) magnesium sulfate injection was approved pursuant to NDA 019316 on September 8, 1986; and (6) neostigmine methylsulfate injection was approved pursuant to NDA 203629 on January 8, 2015.

73.     On January 12, 2024, in response to a December 11, 2023 request from CMS, Fresenius Kabi submitted additional information concerning the proper classification of its NDA for magnesium sulfate injection (NDA 109316).  Letter from Craig Elkins, Fresenius Kabi to Cynthia Denemark, CMS, Re:   Magnesium Sulfate Injection, USP 50% (NDA 019316) Classification (Jan. 12, 2024).

74.     Each of the drugs at issue was marketed by Fresenius Kabi prior to April 1, 2016.

**1.     Heparin Sodium Injection (NDA 017029 and NDA 017651)**

75.     Heparin is an anticoagulant, which "decreases the clotting ability of blood, thereby preventing formation of clots and stopping the growth of already existing clots." *In re Heparin Prods. Liab. Litig.*, 803 F. Supp.2d 712, 720 (N.D. Ohio 2011).

76.     The first NDA for heparin sodium injection was NDA 000552, for a drug branded as Liquaemin.[18]  *See* FDA, Drugs@FDA: FDA-Approved Drugs, https://bit.ly/47DgHXG (last visited Jan. 27, 2024) ("Drugs@FDA") (search term: heparin sodium) (listing NDA #000552 as the first and lowest numbered result under "Heparin Sodium").  It was one of the first NDAs ever filed under the 1938 FDCA, and it took effect on February 9, 1939.  *See id.* (search term: 000552) (last visited Jan. 27, 2024) (noting approval of NDA 000552 on February 9, 1939).  The NDA for Liquaemin and certain other NDAs for heparin sodium injection from the 1940s were in effect as of October 1962 and were deemed approved under the 1962 Amendments.  *See id.* (search term: heparin sodium) (last visited Jan. 27, 2024) (listing heparin sodium products, several of which were approved in the 1930s or 1940s); 35 Fed. Reg. 16608 (Oct. 24, 1970) (describing DESI findings for heparin sodium, demonstrating that the drug was one of those deemed approved in 1962 by Pub. L. No. 87-781, § 107(c)(2), 76 Stat. at 788)).

77.     In October 1970, pursuant to the DESI program, FDA announced that heparin sodium injection was effective for its intended uses.  *See* 35 Fed. Reg. 16608 (Oct. 24, 1970).  The notice specifically applied to Liquaemin (NDA 000552) and the other deemed effective NDAs.

---

[18] "LIQUAEMIN," was a U.S. Registered Trademark, No. 361309 from 1938 through 1999.  The brand name notably earned a dictionary entry for heparin.  *See* Liquaemin, *Merriam-Webster.com Medical Dictionary*, Merriam-Webster, https://www.merriam-webster.com/medical/Liquaemin (last visited Jan. 27, 2024).

*Id.* But the notice also stated that any person "who distributes or intends to distribute" a heparin sodium injection product "should submit a new drug application." *Id*. at 16609.

78.    At the time of the DESI proceeding, Invenex Pharmaceuticals ("Invenex"), the applicant for both heparin sodium injection NDAs involved in this case (NDA 017029 and NDA 017651), marketed generic versions of heparin sodium injection that were not covered by an NDA. *See* Trevor Bayley *et al.*, *Pulmonary and Circulatory Effects of Fibrinopeptides*, 21 Circulation Rsch. 469, 471 (Oct. 1967), https://bit.ly/4b6dF1l (noting the use of Invenex's heparin in a study); FDA, National Drug Code Directory 387 (3d ed. June 1971) (showing 14 Invenex heparin products on the market at that time).  In January 1971, following the October 1970 DESI announcement that heparin was effective for its intended uses, an Invenex representative contacted FDA about the NDA requirement for heparin sodium injection.  Invenex Submission for NDA 017029, Letter from Stanley W. Heir to Dr. Benjamin K. Lee (Jan. 19, 1971).  FDA responded that "it will not be necessary to provide safety and efficacy data for Heparin in the manner that is required in a full NDA."  *Id*.  Instead, Invenex "could use literature references to justify the uses of the products rather than [] demonstrate efficacy in each specific case."  *Id.*  The only new information required would be data regarding the bioavailability of the products to be marketed, which could take the form of anecdotal patient reports.  *See id.*

79.    On or about April 12, 1971, Invenex submitted NDA 017029 (one of the two heparin NDAs at issue in this case) for sodium heparin injection to FDA.  FK Request I, Attachment, Invenex New Drug Application for Sodium Heparin Injection.  The application relied on a 13-page bibliography of published reports to establish safety and efficacy and contained a retrospective analysis of patient reports from three physicians to establish bioavailability.  *Id.*  FDA

approved that application on February 22, 1972.  Letter from Marion J. Finkel to Benjamin K. Lee (Feb. 22, 1972) (Letter transmitted to CMS May 19, 2017).[19]

80.     Invenex submitted a second NDA for sodium heparin injection, NDA 017651, to FDA on or about September 18, 1974.  *See* Letter from Marion J. Finkel to Lypho-Med, Inc. (Feb. 10, 1978) (Letter transmitted to CMS May 19, 2017).  That application also relied solely on literature.  FK Request II at 7.  FDA approved NDA 017651 on February 10, 1978.  Letter from Marion J. Finkel to Lypho-Med, Inc. (Feb. 10, 1978).  FDA's review files for NDA 017651 confirm that Invenex was seeking approval for a generic product.  FDA's summary review stated: "[F]rom a medical point of view this application cannot be objected.  There are approximately 27 [heparin sodium injection] NDAs on the market."  FK Request I at 7.  FDA's pharmacology review similarly stated that heparin is "widely marketed and its properties are well known to the average physician."  Center for Drug Evaluation and Research, *Approval Package for: Application Number: NDA 17-651*, *Pharmacologist's Review of NDA 17-651* at 57, https://bit.ly/490q8ld (last visited Jan 29, 2024); *see also* Summary Basis of Approval (noting that "extensive discussion of the pharmacology of [heparin] can be found in most standard reference books in the field").

81.     None of the heparin sodium injection products marketed under NDA 017029 or NDA 017651 is a branded product.  Fresenius Kabi was unable to identify any sort of exclusivity or patent that ever applied to any of the products, and the statutory exclusivities of the Orphan Drug Act, the Hatch-Waxman Amendments, and similar statutes did not yet exist in the 1970s.  In addition, other heparin sodium injections had been marketed in the United States (including Invenex's own products) prior to the submission of either NDA.  *See, e.g.*, PHYSICIANS' DESK REFERENCE 90 (J. Morgan Jones *et al.* eds. 1946) (listing three different heparin products); FDA,

---

[19] FDA's review file for NDA 017029 does not appear to be publicly available.

NATIONAL DRUG CODE DIRECTORY 387 (3d ed. June 1971) (listing Invenex heparin products). Indeed, the two Invenex NDAs for heparin sodium injection were neither the first nor the only NDAs for heparin sodium injection that FDA approved after the October 1970 DESI announcement.  *See* Drugs@FDA (search term: heparin sodium) (last visited Jan. 27, 2024).[20]

82.     The first edition of FDA's *Orange Book* (which lists FDA-approved drugs and the agency's therapeutic equivalence determinations), published in 1980, identified Invenex's heparin sodium injection products as therapeutically equivalent to **at least 15** other heparin sodium injection products.  *See* HHS, *Approved Prescription Drug Products with Therapeutic Equivalence Evaluations*, 61-62 (1980), https://bit.ly/3tTkW3V.

83.     In its November 22, 2016, and January 23, 2020 submissions to CMS, Fresenius Kabi requested that CMS confirm that the drugs marketed under NDA 017029 and NDA 017651 are non-innovator multiple source drugs because none of those drugs was approved by FDA under an "original NDA" and because they are all generic versions of a well-established drug.  *See* FK Request II at 1, 5-8.[21]

---

[20] Other NDAs for heparin sodium injection stemming from the DESI announcement include:

| Product | NDA | Approval Date |
|---|---|---|
| Heparin sodium injection | 017027 | 11/16/1971 |
| Heparin sodium injection | 017037 | 3/22/1972 |
| Heparin sodium injection | 017007 | 5/28/1974 |
| Heparin sodium injection | 017064 | 11/22/1974 |
| Heparin sodium injection | 017036 | 2/24/1975 |
| Heparin sodium injection | 017486 | 12/10/1975 |
| Heparin sodium injection | 017780 | 4/21/1978 |
| Heparin sodium injection | 017979 | 12/21/1978 |

[21] Although CMS has issued decisions with respect to both NDA 017029 and NDA 017651, Fresenius Kabi is still waiting for a ruling from CMS as to certain national drug codes ("NDCs") associated with NDA 017029.

84.     *First*, as to NDA 017651, Fresenius Kabi explained that "the applicant [Invenex Pharmaceuticals] relied on FDA's previous finding, made during DESI review" of other heparin drugs, "that heparin sodium injection was safe and effective." *Id.* at 7 (citing 35 Fed. Reg. 16608 (Oct. 24, 1970) (confirming the effectiveness of heparin sodium injection products marketed under the 1939 NDA 000552 for Liquaemin, under NDA 005521 by Eli Lilly, and under NDA 004570 by The Upjohn Company)).

85.     Fresenius Kabi further highlighted FDA's determination with respect to NDA 017651, that there were "approximately 27 [heparin sodium injection] NDAs on the market" as of the mid-1970s. *Id.* (quoting Summary of NDA 17-651 at 1). Fresenius Kabi thus showed that "the applicant relied on FDA's prior determination that the porcine-derived heparin sodium was safe and effective and submitted its application under the regulatory ANDA pathway." *Id.* Indeed, FDA had noted that Heparin was "discovered in 1916" and that the "first clinical trials were conducted in 1937." Summary Basis of Approval at 2.

86.     *Second*, and similarly, Fresenius Kabi showed that FDA's approval of NDA 017029 on February 22, 1972, was based on FDA's determination through the DESI program that prior heparin sodium injection products were safe and effective for the same indications. FK Request II at 7-8 (citing 35 Fed. Reg. 16608 (Oct. 24, 1970)). Fresenius also provided CMS with the approval letter for NDA 017029.

87.     On May 29, 2020, Fresenius Kabi updated its submission for NDA 017029. Email from Trevor Wear to Charlotte Amponsah *et al.*, *RE: Request for Additional Information* (May 29, 2020). Among other things, Fresenius Kabi submitted the application for NDA 017029, including

the cover letter to the application that includes the re: line of "New Drug Application for Sodium Heparin Injection (DESI 552)." *Id.*[22]

88.     For all of these reasons, NDA 017029 and NDA 017651 were not originally approved under an original NDA, and the heparin sodium injection products marketed by Fresenius Kabi under these NDAs are non-innovator multiple source drugs, including for the period prior to April 1, 2016.

### 2.     Oxytocin Injection (NDA 018248)

89.     Oxytocin is a naturally occurring hormone discovered in 1909 by the British scientist Sir Henry Dale.  *See* C.E.C. den Hertog *et al.*, History and Use of Oxytocics, 94 Eur. J. Obstetrics & Gynecology and Reproductive Biology 8, 11 (2001).  A means of synthesizing oxytocin was discovered in 1954 by the American biochemist Vincent du Vigneaud, who won the Nobel Prize for his work on oxytocin.  *Id.* at 8, 11.

90.     Oxytocin injection is used to help pregnant women start or continue labor and to help control bleeding after delivery.  *Id.*  Oxytocin injection has been marketed in the United States under the brand name Pitocin since the 1920s.  *See* PITOCIN, Registration No. 254956.  Oxytocin has also been marketed under the brand name Syntocinon since the 1950s.  *See* SYNTOCINON, Registration No. 637952.

91.     Because it was introduced in the 1920s, oxytocin injection was marketed without the submission of an NDA under the 1938 FDCA.  *See* PHYSICIANS' DESK REFERENCE 254 (J. Paul Folsom *et al.* eds., 8th ed. 1953) (listing several oxytocin drugs).  And because there was no NDA

---

[22] Fresenius Kabi's submission also included: (i) a copy of NDA 017029 as submitted to FDA; and (ii) correspondence from the drug master file holder for heparin sodium injection (The Wilson Laboratories) and third parties carrying out sterility and pyrogen testing describing the application as an "abbreviated" NDA.  *See id.*

in effect for oxytocin injection in October 1962, oxytocin injection was not included in the DESI Program.  *See* Drugs@FDA (search term: oxytocin) (last visited Jan. 27, 2024) (not listing any oxytocin approved prior to 1980).  As a result, all branded and generic versions of oxytocin injection marketed in the United States lacked FDA approval until the late 1970s.

92.     During 1977 and 1978, FDA's Ob/Gyn Advisory Committee reviewed the labeling and use of unapproved oxytocin injection products, including Pitocin and Syntocinon.  *See* 43 Fed. Reg. 15,780 (Apr. 14, 1978).  The Advisory Committee determined that the labeling should be revised in certain respects.  *See id.* at 15,779-80.  On or about July 28, 1978, FDA told Invenex, the filer of the NDA at issue here, and the other manufacturers of marketed oxytocin injection products that labeling changes would be necessary in light of the Advisory Committee's recommendation.  *See* FK Request II, Attachment 3.2.1, Letter from Dr. Marion Finkel to Invenex Pharmaceuticals (July 28, 1978).  FDA also informed Invenex and the other manufactures that the agency now considered oxytocin to be a new drug that required FDA approval.  *Id.* at 1.  FDA instructed Invenex and the other sponsors (i) to submit an NDA within 120 days after the receipt of the final revised labeling, *id.*, (ii) that the "NDA should include complete manufacturing controls and the final printed labeling," *id.* at 2, **but** (iii) "Clinical and pharmacological data will not be required," *id.*

93.     On or about August 31, 1978, FDA provided the final revised labeling to Invenex and the other manufacturers.[23]  *See* FK Request II, Attachment 3.2.2, Invenex Submission for NDA

---

[23] The other branded and generic oxytocin NDAs were as follows:

| Product | NDA | Approval Date |
| --- | --- | --- |
| Pitocin (oxytocin injection) | 018261 | 11/19/1980 |
| Syntocinon (oxytocin injection) | 018245 | 4/17/1980 |
| Oxytocin injection | 018243 | 4/29/1980 |

018248, Letter from Marion J. Finkel to Invenex Pharmaceuticals (Aug. 31, 1978).  FDA requested that Invenex and the other manufacturers submit their NDAs with final labeling and manufacturing information within 120 days.  *Id.*

94.   On January 4, 1979, Invenex submitted a new drug application for NDA 018248. *Id.*, Invenex Submission for NDA018248.   In compliance with FDA's August 31, 1978 correspondence, NDA 018248 did not contain ***any*** studies or other information related to the safety or efficacy of oxytocin injection—not even a literature review or bibliography. *See id.* (referencing the August correspondence in its cover letter).   Invenex submitted only revised labeling and manufacturing information for NDA 018248.  *Id.*

95.   FDA's review files for NDA 018248 confirm that the NDA was not required to submit any animal or clinical studies and was not intended to address safety or efficacy. *See* Summary Basis of Approval for NDA 18-248 (noting that "the submission of in-vivo bioavailability data . . . is waived for this drug product" and that the review contained "[n]o input from Pharmacology" because the "NDA was submitted in response to a letter of Dr. Finkel . . . requesting a change in the labeling").

96.   FDA approved NDA 018248 on July 9, 1980.  Letter from Marion J. Finkel to Richard E. Greco (July 9, 1980) (Letter transmitted to CMS May 19, 2017).  The drug products marketed under NDA 018248 were never branded and were always marketed as generic oxytocin injections.  Fresenius Kabi was unable to identify any sort of exclusivity or patent that ever applied to any of the products, and statutory exclusivities did not yet exist in 1980.  The third edition of FDA's *Orange Book*, published in 1982, identified Invenex's generic oxytocin injection as therapeutically equivalent to both Pitocin and Syntocinon, as well as the generic oxytocin injection

approved pursuant to NDA 018243. *See* HHS, *Approved Prescription Drug Products with Therapeutic Equivalence Evaluations*, 3-127 (3d ed. 1982), https://bit.ly/3S3XXuZ.

97.    Fresenius Kabi requested that CMS confirm that its oxytocin injection (NDA 018248) is a non-innovator multiple source drug because NDA 018248 was not an original NDA and because it is a generic drug. *See* FK Request II at 1, 20, 22-23.

98.    Fresenius Kabi also explained that no clinical studies were included in the NDA and that FDA had found Invenex's generic oxytocin injection to be therapeutically equivalent to the branded product, Pitocin. *Id.* at 22.

99.    Fresenius Kabi also submitted the July 28, 1978 correspondence from FDA requesting that Invenex "submit a new drug application (NDA)" and clarifying that "***clinical and pharmacological data will not be required***." *Id.*, Attachment 3.2.1 (emphasis added).

100.    For all of these reasons, NDA 018248 was not originally approved under an original NDA, and oxytocin injection marketed by Fresenius Kabi should be classified as a non-innovator multiple source drug, including for the period prior to April 1, 2016.

### 3.    Furosemide Injection (NDA 018902)

101.    Furosemide injection is indicated for the treatment of edema (*i.e.*, fluid retention and excess fluid held in body tissues). *See* Mayo Clinic, *Furosemide (Injection Route)*, https://bit.ly/3S7FKfV (updated Jan. 1, 2024). Furosemide was discovered by German scientists in 1959, and a patent in the United States was obtained by Hoechst AG ("Hoechst") in 1962. *See* U.S. Patent No. 3,058,882. On December 8, 1965, Hoechst submitted to FDA the NDA for the pioneer version of furosemide injection (NDA 016363). *See* Finkel Statement ¶ 13. FDA approved Hoechst's NDA on March 20, 1968, and Hoechst marketed the drug under the brand name Lasix. *See* LASIX, Registration No. 1182661.

102.    In the mid-1970s, a different company called International Medication Systems Ltd. ("IMS") sought to market a generic version of furosemide injection.  After first arguing, unsuccessfully, that it did not need to seek FDA's approval for its generic version of furosemide injection, IMS filed a literature-based NDA for generic furosemide injection (NDA 018025), which was approved as a "paper NDA" on January 10, 1979. *See* 45 Fed. Reg. 82052, 82053 (Dec. 12, 1980) (referring to IMS as "the company that has obtained the first approval of a literature supported NDA for a generic version of a post-1962 drug").[24]

103.    On November 5, 1982, Invenex submitted NDA 018902 (at issue in this litigation), which was another literature-based, "paper NDA" for another generic version of furosemide injection.  FK Request II, Attachments 2.5.2 and 2.5.3.  FDA approved NDA 018902 on May 22, 1984, just a few months before the Hatch-Waxman Amendments were passed.  Letter from Marvin Seife to Richard E. Greco (Apr. 11, 1985) (Letter transmitted to CMS May 19, 2017) (referencing the FDA approval letter from May 22, 1984).

104.    Shortly after Invenex's NDA 018902 was approved, FDA transferred that NDA's oversight to the agency's Division of Generic Drugs.  *See* Letter from Dr. Marvin Seife, Director, Division of Generic Drugs, FDA (June 6, 1984) (citing 49 Fed. Reg. 9864 (Mar. 16, 1984)).

105.    The generic furosemide injection marketed by Invenex under NDA 018902 was never marketed with a brand name, and Fresenius Kabi was unable to identify any form of

---

[24] Following that approval, four more "paper NDAs" were approved for generic versions of furosemide injection:

| Product | NDA | Approval Date |
|---|---|---|
| Furosemide injection | 018267 | 5/19/1981 |
| Furosemide injection | 018420 | 2/26/1982 |
| Furosemide injection | 018667 | 5/28/1982 |
| Furosemide injection | 018579 | 11/30/1983 |

exclusivity or patent covering the drug. The generic furosemide injection marketed by Invenex under NDA 018902 was at least the ***seventh*** entrant into the furosemide injection market in the United States. The Invenex drug thus entered a product category that had been multiple source for several years. The 1985 version of the *Orange Book* identified the generic furosemide injection marketed by Invenex under NDA 018902 as therapeutically equivalent to eight other versions of furosemide injection, including the pioneer product, Lasix, marketed by Hoescht. *See* HHS, *Approved Drug Products with Therapeutic Equivalence Evaluations*, 3-96 (6th ed. 1985), https://bit.ly/3u3CJFr.

106. Fresenius Kabi requested that CMS confirm that its furosemide injection is a non-innovator multiple source drug because it was not approved as an original NDA and was instead approved under a paper NDA. *See* FK Request II at 1, 20-21.

107. Fresenius Kabi explained that NDA 018902 was a paper NDA that had been approved based solely on published reports shortly before the Hatch-Waxman Amendments. *Id.* at 21. Fresenius Kabi explained that, in January 1979, FDA had approved a prior paper NDA for a generic version of injectable furosemide. *Id.* (citing *Hoffmann-La Roche, Inc. v. Harris*, 484 F. Supp. 58 n.2 (D.D.C. 1979)). Fresenius Kabi also explained that shortly after approval, FDA transferred regulatory oversight of NDA 018902 to the "Division of Generic Drugs." *See id.* (citing Attachment 2.5.1, thereto).

108. For all of these reasons, NDA 018902 was not originally approved under an original NDA, and the furosemide injection products marketed by Fresenius Kabi are non-innovator multiple source drugs, including for the period prior to April 1, 2016.

### 4. Magnesium Sulfate Injection (NDA 019316)

109. The Fresenius Kabi products marketed under NDA 019316 are sterile water solutions of magnesium sulfate heptahydrate ($MgSO_4 \cdot 7H_2O$), *see* Prescribing Information for

NDA 019316 (Feb. 2016), which is commonly known as epsom salt.  *See*, *e.g.*, 22 Fed. Reg. 9593, 9594 (Nov. 30, 1957) (FDA statement of policy that "[m]agnesium sulfate heptahydrate should be listed on the label of a drug product as epsom salt, which is its common or usual name").

110.    Medicinal use of epsom salt dates to at least the seventeenth century. *See*, *e.g.*, Milton L. McCall & Donald Sass, *The Action of Magnesium Sulfate on Cerebral Circulation and Metabolism in Toxemia of Pregnancy*, 71 Am. J. Obst. & Gynec. 1089, 1089 (1956) (observing that magnesium sulfate was discovered in 1618, was identified in a medical treatise in 1645, and thereafter became "one of the most important medications in the physicians' armamentarium."). The medical literature indicates that magnesium sulfate injection became a common treatment for eclampsia during pregnancy (one of its present-day indications) during the mid-1920s.  *See*, *e.g.* E.M. Lazard, *A Preliminary Report on the Intravenous Use of Magnesium Sulphate in Puerperal Eclampsia*, 9 Am. J. Obst. & Gynec. 178, 178 (1925).  Specifications for the preparation of sterile water solutions of 50% magnesium sulfate heptahydrate for injection had been broadly published no later than 1946.  *See* The National Formulary 313-14 (8th ed. 1946); *see also* The United States Pharmacopeia 350-51 (17th ed. 1965).

111.    Because magnesium sulfate injection was commonly used in medicine prior to the enactment of the FDCA in 1938, such products were long marketed in the United States without FDA approval.  For instance, the inaugural 1947 edition of the Physician's Desk Reference identified magnesium sulfate injection products marketed in the United States by eleven different companies.  Physicians' Desk Reference 98 (J. Morgan Jones *et al.* eds. 1946).  Two aspects of that product list are notable.  First, none of the products was listed with a "brand" or "trade" name; they were instead all identified by the generic name "magnesium sulfate." *Id.*  Second, there was no evidence of an NDA covering any of those eleven products.  It therefore seems clear that the

U.S. market for magnesium sulfate injection had become "multiple source" through exclusively unapproved products by 1947 at the latest.

112.    Other evidence from FDA confirms that magnesium sulfate was long marketed as an unapproved drug.  In 1984, an unapproved intravenous drug product led to many deaths in the United States.  The resulting congressional inquiry revealed that the manufacturer of the drug in question had been marketing many other unapproved prescription drugs, including magnesium sulfate injection.  *See* FDA Memorandum, *O'Neal, Jones, and Feldman Drug Products Listed in the 1984 PDR but Not Approved By FDA* (Aug. 27, 1984).  The inquiry also caused FDA to create a list (known as the "Weiss List" after former Representative Ted Weiss) of all unapproved prescription drugs marketed in the United States.  *See, e.g.*, Letter from Rep. Ted Weiss to Comm'r Designate Frank Young (May 21, 1984); Letter from Comm'r Frank Young to Rep. Ted Weiss (Sept. 14, 1984); Letter from Assoc. Comm'r Robert Wetherell to Rep. Ted Weiss (Sept. 25, 1984).  Magnesium sulfate injection was one of the products identified.  *See* FDA, *Computer Generated Listing of Drugs Marketed Without an Approved NDA/ANDA*, 834-35 (1984).

113.    FDA intended to use the Weiss List as the basis for a program called the "Prescription Drug Wrap Up," which would have reviewed all unapproved drugs that had not been addressed through the DESI program.  In 1987, FDA identified magnesium sulfate injection as one of the categories of unapproved prescription drugs that was subject to the Prescription Drug Wrap Up.  *See* FDA, *Marketed, Unapproved Prescription Drug Entities* (Nov. 6, 1987).  FDA identified 20 specific magnesium sulfate injection products as prescription drugs that were marketed without any approved or effective application.  *See* Letter from Fresenius Kabi to CMS at 3 (identifying specific magnesium sulfate drugs).  In addition, FDA's *Orange Book* identifies all approved prescription drugs marketed in the United States.  Prior to 1986, however, the *Orange*

*Book* did not identify any approved magnesium sulfate injection product.  In sum, the U.S. market for magnesium sulfate injection consisted exclusively of unapproved products through at least 1985.

114.    Like other sterile injectables, magnesium sulfate was historically shipped in glass containers.  *See*, e.g., THE UNITED STATES PHARMACOPEIA 351 (17th ed. 1965) (magnesium sulfate injection should be packaged in "Type I glass" containers).  However, in the 1960s and 1970s, the development and adoption of blow-fill-seal technology made it possible for sterile injectables to be packaged in plastic containers.  *See* Alexandre Fontayne, *Blow-Fill-Seal Technology and Vaccine Delivery*, Life Sci. & Indus. Mag. (Dec. 13, 2022).  In 1974, FDA observed that this raised special concerns because plastic containers presented "potential problems such as leaching and migration from the plastic into the drug product as well as drug adsorption and absorption by the plastic container."  39 Fed. Reg. 39473, 39473 (Nov. 7, 1974).  FDA therefore declared that all injectable drugs packaged in plastic—including those that were generally recognized as safe and effective when shipped in glass—were deemed to be new drugs.  *See id.*[25]

115.    The sponsor of NDA 019316 (at issue in this litigation) was Invenex.  Prior to submitting that application, Invenex had marketed magnesium sulfate injection in glass vials without FDA approval like many other companies.  *See*, e.g., PHYSICIANS' DESK REFERENCE 316 (Barbara B. Huff *et al.* eds., 33d ed. 1979) (identifying Invenex as one of 3 sources of magnesium sulfate injection).  Invenex submitted NDA 019316 on June 13, 1984 solely to obtain FDA's permission to market magnesium sulfate injection in a plastic container.  The cover letter for the NDA thus stated:

---

[25] As noted above, *see supra* note 11, FDA promulgated a regulation stating that any "parenteral drug product packaged in a plastic immediate container … requires an approved new drug application as a condition for marketing."  43 Fed. Reg. 58557, 58562 (Dec. 15, 1978).

[W]e are submitting three copies of our New Drug Application for Magnesium Sulfate Injection, USP 50%, packaged in a 3 ml plastic vial.

We should like to point out that INVENEX LABORATORIES has manufactured Magnesium Sulfate Injection, USP in glass vials for over 25 years.

Letter from Donald Harrigan, Invenex to Dr. Patricia Russel, FDA (June 13, 1984). FDA's subsequent review of the NDA confirms that the NDA was submitted solely to obtain permission to modify a pre-existing magnesium sulfate injection product with a plastic container. *See* Review and Evaluation of Pharmacology and Toxicology Data (July 2, 1985) ("Magnesium sulfate injection, USP 50% is currently marketed by the sponsor in glass vials. The reason for submitting this NDA is that the sponsor intends to market the product in plastic vials. With the exception of using plastic vials, the finished dosage form is identical to the currently marketed product.").

116.    Further, NDA 019316 was based solely on published literature. The application was originally submitted three-and-a-half months prior to the passage of the Hatch-Waxman Amendments. At the time, NDA 019316 contained no safety or effectiveness data at all, not even published reports. Instead, the application simply stated: "This product has been marketed for over fifty years and is classified as a 'Grandfather' drug. Therefore the safety and efficacy of this product has been clearly established." NDA 019316, Item 3 – Evaluation of Safety and Effectiveness (June 13, 1984).

117.    At first, FDA seemed inclined to accept that approach. An initial review by the FDA Medical Officer from July 1984 recommended approval, noting: "$MgSO_4$ has been marketed for over fifty years and is a 'Grandfathered' drug. In most centers in the U.S. $MgSO_4$ is the drug of choice to treat preeclampsia-eclampsia and may be given either intravenously, intramuscularly or a combination of both routes." Medical Officer's Summary of NDA Supplement 19-316 (July 11, 1984).

118.    FDA informed Invenex that the NDA would "not be accepted for review due to lack of supporting literature."  Telephone Report re: NDA 19-316 (Aug. 22, 1984).  FDA later explained that NDAs submitted to comply with the plastic-container rule, 21 C.F.R. § 310.509, must establish "clinical safety and efficacy," but that the agency was "willing to accept literature reports to fulfill this requirement."  Letter from Dr. Solomon Sobel, FDA to Donald Harrigan, Invenex (Oct. 18, 1984).  Invenex resubmitted NDA 019316 on April 3, 1985.  The resubmitted application included a literature review to show safety and efficacy.  *See* NDA 19-316, Attach. 1 (Apr. 3, 1985).  The review concluded that "the use of Magnesium Sulfate Injection, USP . . .  is well supported by the literature.  Additionally, as this product is a 'grandfather' drug, it has been widely and effectively used for these indications for a number of years."  *Id*. at 6.

119.    FDA thereafter requested additional supportive literature regarding the use of magnesium sulfate in the treatment of eclampsia during pregnancy, which Invenex provided in September 1985.  *See* Letter from Donald Harrigan, Invenex to Dr. Solomon Sobel, FDA (Sept. 12, 1985) ("Provided in Attachment #3 is a series of [eight] articles [published between 1925 and 1955] regarding the use of Magnesium Sulfate in the treatment of eclampsia of pregnancy.").

120.    FDA's substantive review of NDA 019316 focused on that last submission.  The Medical Officer again acknowledged that "$MgSO_4$ has been marketed for over fifty years and is a 'Grandfathered' drug" as well as "the drug of choice to treat preeclampsia-eclampsia."  Medical Officer's 2nd Review of NDA 19-316 (Jan. 8, 1986).  After reviewing the "8 references" that Invenex had "enclosed for review," the Medical Officer concluded that the drug was effective for its intended uses.  *Id*. at 1 ("There is no doubt in this reviewer's mind as to the efficacy of this product in treating preeclampsia-eclampsia….").  Accordingly, the Medical Officer "strongly

recommend[ed] approval." *Id*. at 2. FDA approved the NDA on September 8, 1986. *See* Letter from Dr. Solomon Sobel, FDA to LyphoMed, Inc. (Sept. 8, 1986).

121. In sum, magnesium sulfate injection was marketed for decades without FDA approval because it was considered by both FDA and industry to be a grandfathered drug. The U.S. market for magnesium sulfate injection was multiple source long before Invenex began selling its magnesium sulfate injection in glass vials. NDA 019316 was submitted as a literature-based application solely to obtain FDA's approval to market magnesium sulfate injection in a plastic container. The generic magnesium sulfate marketed by Invenex under NDA 019316 was never marketed with a brand name, and Fresenius Kabi was unable to identify any form of exclusivity or patent covering the drug.

122. For all of these reasons, NDA 019316 was not originally approved under an original NDA, and the magnesium sulfate injection products marketed by Fresenius Kabi are non-innovator multiple source drugs, including for the period prior to April 1, 2016.

### 5. Neostigmine Methylsulfate Injection (NDA 203629)

123. Neostigmine methylsulfate injection is an anti-paralytic used after surgeries to reverse the paralytic effects of general anesthesia. *See* Mayo Clinic, *Neostigmine (Injection Route)*, https://bit.ly/3UbGDXs (updated Apr. 1, 2023). It was discovered in 1931 by scientists working for Hoffman-LaRoche, Inc. ("Roche") and was marketed by Roche as Prostigmin prior to the 1938 Act. *See* PROSTIGMIN, Registration No. 293889; John A. Aeschlimann & Marc Reinert, *The Pharmacological Action of Some Analogues of Physostigmine*, 43 J. OF PHARMACOLOGY AND EXPERIMENTAL THERAPEUTICS (Nov. 1931), https://bit.ly/3vMdY1a.[26]

---

[26] Prostigmin was the subject of at least two patents obtained by Roche. *See* U.S. Patent No. 1,905,990 (filed 1933); U.S. Patent No. 2,208,485 (filed 1940).

124.   Prostigmin and generic versions of neostigmine methylsulfate injection were marketed in the United States without FDA approval from before 1938 until 2013.  *See* Center for Drug Evaluation and Research, *Pharmacology Review for NDA 204078* at 6-7, https://bit.ly/3Hp6fIW  (last visited Jan. 29, 2024) (noting that "[a]ccording to archival records at the FDA, neostigmine in various dosage forms has been marketed in the United States since 1932" and referring to other "marketed-unapproved drug products" on the market as of 2013).

125.   In 2011, Eclat Pharmaceuticals ("Eclat") began discussing the possibility of seeking FDA's approval for neostigmine methylsulfate injection as part of FDA's Unapproved Drug Initiative.  *See generally* FDA, *Compliance Policy Guide, Sec. 440.100 Marketed New Drugs Without Approved NDAs and ANDAs* (Sept. 2011), https://bit.ly/429VCTD.  In June 2011, FDA informed Eclat that approval could be obtained for neostigmine methylsulfate injection pursuant to a 505(b)(2) application that relied solely on published literature.  *See* Center for Drug Evaluation and Research, Medical Review for NDA 204078 at 16, https://bit.ly/3vLYzhb (last visited Jan. 29, 2024) ("The published efficacy data appeared to be of the type that would support the proposed indication.").   In June 2012, Eclat submitted a literature-based 505(b)(2) application (NDA 204078) for neostigmine methylsulfate injection.  FDA approved Eclat's NDA on May 31, 2013. Letter from Rigoberto Roca to Marla E. Scarola (May 31, 2013), https://bit.ly/47PsvXh.  Eclat chose to market its neostigmine methylsulfate injection as a branded product using the brand name Bloxiverz.  *Id.*

126.   Fresenius Kabi submitted its own literature-based Section 505(b)(2) application for neostigmine methylsulfate injection (NDA 203629, which is at issue here) to FDA in December 2011.  Letter from Allison Meyer to James Harn (received Jan. 5, 2012) (acknowledging 505(b)(2) NDA 203629 as being submitted on Dec. 28, 2011).  But Bloxiverz won the race for approval,

thus making Fresenius Kabi's pending product a follow-on.  *See* Letter from Rigoberto Roca to Dale Carlson (Jan. 8, 2015) (Letter transmitted to CMS May 19, 2017).  Rather than force Fresenius Kabi to resubmit its pending Section 505(b)(2) application as an ANDA, FDA permitted Fresenius Kabi to proceed with its existing Section 505(b)(2) application for a generic duplicate of the Eclat product.  *See id.;* ANDA Guidance at 5.

127.    On January 8, 2015, FDA approved Fresenius Kabi's 505(b)(2) application for generic neostigmine methylsulfate injection (NDA 203629).  *See* Letter from Rigoberto Roca to Dale Carlson (Jan. 8, 2015) (Letter transmitted to CMS May 19, 2017).

128.    Fresenius Kabi's neostigmine methylsulfate injection is not marketed with a brand name, and Fresenius Kabi was unable to identify any statutory exclusivity or patent covering the drug, which has always been part of a multiple-source product category.

129.    The 2016 edition of the *Orange Book* identified Fresenius Kabi's neostigmine methylsulfate injection as therapeutically equivalent to both Bloxiverz and a subsequently approved ANDA for another generic neostigmine methylsulfate injection product.  *See* HHS, *Approved Drug Products with Therapeutic Equivalence Evaluations*, 3-274 (36th ed. 2016), https://bit.ly/47MBdFz.

130.    Fresenius Kabi also sought classification of its neostigmine methylsulfate injection product as a non-innovator multiple source drug because it has always been a generic drug and because NDA 203629 is not an original NDA.  *See* FK Request II at 1-2, 10-11.

131.    Fresenius Kabi explained that NDA 203629 was a Section 505(b)(2) application that contained "no original clinical trial data" and was instead a "literature-based submission[]."  *Id.* at 10.  It also explained that "FDA reviewers observed that the application 'relied solely on

published literature for providing evidence of safety, efficacy, and appropriate dosing requirements.'" *Id.* (quoting Clinical Review, NDA 203629 at 4 (Sept. 18, 2012)).

132. Fresenius Kabi also highlighted that FDA "acknowledged that the application was 'largely based on published literature of nonclinical and clinical data (including clinical pharmacology).'" *Id.* at 11 (quoting FDA, Summary Review for Regulatory Action, NDA 203629 (Jan. 8, 2015), at 2).

133. For all of these reasons, Fresenius Kabi's neostigmine methylsulfate injection is non-innovator multiple source drug, including for the period prior to April 1, 2016.

### B.     The Decision in *STI Pharma, LLC v. Azar*

134. On March 23, 2020, before CMS issued its determinations on the drugs at issue here, the United States District Court for the District of Columbia issued a decision rejecting CMS's position that "original NDA" just meant "NDA" in the pre-2019 version of Section 1927.

135. In that case, soon after CMS published its Final Rule interpreting the meaning of "original NDA" under the MDRP, Plaintiff STI Pharma requested that CMS reclassify its drug Sulfatrim as a non-innovator multiple source drug.

136. CMS granted the request only for the period April 1, 2016 forward because "[t]he Final Rule, which was . . . effective April 1, 2016, established the narrow exception process to address the limited circumstances where drugs approved under an NDA might be more appropriately treated as if they were approved under an ANDA and classified as noninnovator multiple source drugs." *STI Pharma*, 613 F.Supp.3d at 161.

137. CMS applied that classification only prospectively because "[a] drug category change pursuant to a narrow exception request approval does not apply to reporting periods prior

to the effective date of the Final Rule because the narrow exception did not exist before that date." *Id.* at 161.

138.    The District Court in *STI Pharma* rejected CMS's reliance upon the effective date of the Final Rule.  It explained that "[t]he question of statutory interpretation presented here is whether the pre-2019 version of the MDRP statute answers the question whether a duplicate drug marketed pursuant to a pre-Hatch-Waxman paper NDA constituted an 'innovator multiple source' or a 'noninnovator multiple source' drug." *Id.* at 164.  The District Court held, based on the language of the MDRP statute, and without regard to CMS's Final Rule, that STI Pharma's drug qualified as a non-innovator multiple source drug subject to lower MDRP rebate obligations because paper NDAs were not "original NDAs" within the meaning of the statute.

139.    As to the text of the statute, the District Court explained that the MDRP statute identified three categories of drugs: (1) "single source drug[s]," (2) "innovator multiple source drug[s]," and (3) "noninnovator multiple source drug[s]." *Id.* at 154.

140.    Prior to 2019, a "multiple source drug" was a drug "for which there [is] at least 1 other drug product which" is equivalent in defined respects.  42 U.S.C. § 1396r-8(k)(7)(A)(i) (2012).  A "single source drug" was a drug marketed "under an original new drug application approved by the" FDA.  *Id.* § 1396r-8(k)(7)(A)(iv).  An "innovator multiple source drug" was a "multiple source drug that was originally marketed under an original new drug application approved by the" FDA.  *Id.* § 1396r-8(k)(7)(A)(ii).  A "noninnovator multiple source drug" was a "multiple source drug that is not an innovator multiple source drug."  *Id.* § 1396r-8(k)(7)(A)(iii).

141.    As to the term "original," the Court concluded that "[w]hat matters is that a paper NDA for a duplicate drug . . . could not be approved without making reference to a previously approved—or 'original'—new drug application."  *STI Pharma*, 613 F.Supp.3d at 167.

142.     Likewise, as to the term "innovator," the Court concluded that "Congress intended to distinguish between pioneer drugs, like most drugs approved under the post-Hatch-Waxman NDA process, and follow-on drugs, like ANDAs and paper NDAs for duplicate drugs." *Id.*

143.     The Court concluded that this reading was most consistent with the statutory purpose because Congress enacted the MDRP statute in 1990 "to offset Medicaid costs incurred by the federal government and the states for outpatient drugs provided to Medicaid recipients." *Id.* at 157 (quoting *Council on Radionuclides*, 2019 WL 5960142, at *2).

144.     In particular, "[l]ow-cost generic drugs" presented less of a financial problem than did higher-cost novel drugs that had benefited from the patent protection or regulatory exclusivities provided by the Orphan-Drug Act or the Hatch-Waxman Amendments. *Id.* at 168.  As the Court explained, "[t]he difference in the rebate rates for 'single source' and 'innovator multiple source drugs' as compared to 'noninnovator multiple source drugs' reflects that reality." *Id.*

145.     Lastly, the Court noted that, even though it need "not rely on the legislative history of the relevant version of the MDRP statute, particularly in light of the clarity of statutory text," *id.* at 169, the legislative history "confirms that Congress intended to draw a distinction between branded, innovator drugs and follow-on, generic drugs." *Id.* at 169.  Specifically, "[a]ccording to the Explanatory Material Concerning Committee on Finance Reconciliation Submission Pursuant to House Concurrent Resolution 310, manufacturers . . . of 'single-source' or 'patented' drugs and 'innovatory multiple-source' or 'brand-name' drugs with a 'generic equivalent' would be required to pay a higher rebate." *Id.* (quoting 101 Cong. Rec. 30,515 (daily ed. Oct. 18, 1990)).  The Court explained, "[i]n other words, the rebate was higher for patented and brand-name drugs and lower for generic drugs." *Id.*

146.    As a result, the Court in *STI Pharma* ruled that CMS's refusal to reclassify a drug adopted through a paper NDA as a non-innovator multiple source drug for the period prior to April 1, 2016 was not accordance with law and must be set aside.  *See* 5 U.S.C. § 706(2)(A).

147.    CMS did not appeal the decision in *STI Pharma*.  Instead, on December 31, 2020, CMS took the formal position, in connection with its adoption of rules implementing the 2019 Amendments to the MDRP statute, that "*STI Pharma, LLC v. Azar* was wrongly decided."[27]

148.    According to CMS, "[p]rior to the 2016 [Covered Outpatient Drug] final rule, there was no narrow exception to that general rule.  Therefore, any drug approved under an NDA that is reported as a noninnovator multiple source drug for quarters prior to 2Q2016 is improperly categorized . . . ."  85 Fed. Reg. 87,032.

### C.    CMS's Decisions as to the Fresenius Kabi Drugs

149.    In five letters, each issued long after the decision in *STI Pharma*, CMS approved, but only in part, Fresenius Kabi's requests to confirm that the Fresenius Kabi drugs at issue are non-innovator multiple source drugs.

150.    The two CMS letters dated January 4, 2021 addressed Fresenius Kabi drugs marketed under NDA 017029 for heparin sodium injection, NDA 203629 for neostigmine methylsulfate injection, and NDA 018248 for oxytocin injection.  The third CMS letter, dated June 9, 2021, addressed Fresenius Kabi drugs marketed under NDA 18902 for furosemide injection.  The fourth CMS letter, dated February 7, 2024, addressed drugs marketed under NDA 019316 for

---

[27] *See* Final Rule, Medicaid Program; Establishing Minimum Standards in Medicaid State Drug Utilization Review (DUR) and Supporting Value-Based Purchasing (VBP) for Drugs Covered in Medicaid, Revising Medicaid Drug Rebate and Third Party Liability (TPL) Requirements, 85 Fed. Reg. 87000, 87032 (Dec. 31, 2020).

magnesium sulfate injection.  Finally, the fifth CMS letter, dated February 27, 2024, addressed drugs marketed under NDA 107651 for heparin sodium injection.

151.    In all five letters, CMS agreed that each of the Fresenius Kabi drugs identified by CMS is properly classified as a non-innovator multiple source drug because "[a]fter the review of your request and the information submitted with the request, we agree to exercise our discretion to grant a narrow exception."  *See* Letter from John M. Coster to Jack C. Silhavy at 1 (Jan. 4, 2021) ("CMS Heparin (NDA 017029) and Oxytocin Decision"); Letter from John M. Coster to Jack C. Silhavy (Jan. 4, 2021) at 1 ("CMS Neostigmine and Heparin Decision"); Letter from John M. Coster to Jack C. Silhavy (June 9, 2021) at 1 ("CMS Furosemide Decision"); Letter from Cynthia R. Denemark to Craig Elkins (February 7, 2024) at 1 ("CMS Magnesium Sulfate Decision"); Letter from Cynthia R. Denemark to Craig Elkins (Feb. 27, 2024) (CMS Heparin (NDA 017651) Decision").

152.    In all five letters, in the "Background" section, CMS provided its interpretation of Section 1927 of the SSA.  CMS, however, gave no indication of how it applied either the statutory definitions or the narrow exception standard to the Fresenius Kabi drugs at issue.  Instead, CMS stated only that "[t]his approval applies only to the aforementioned [drugs] and does not apply to any other [drugs] under the NDA provided in your request . . . , nor to any other NDAs."  *See*, *e.g.*, *id*. at 2.

153.    In all five letters, CMS directed that the "effective date" of its "approval" of Fresenius Kabi's request for these drugs (and their individual drug codes) "is April 1, 2016, the

effective date of the Final Rule." *See*, *e.g.*, *id*. at 3.[28]   That is the same analysis that the District Court rejected in *STI Pharma*.

154.    CMS further stated, with respect to heparin sodium injection, oxytocin injection, furosemide injection, and magnesium sulfate injection, that they were "reported as [non-innovator multiple source drugs] to the [MDRP]" and therefore have "been misclassified through March 31, 2016."   CMS Heparin (NDA 017029) and Oxytocin Decision at 3; *see also* CMS Furosemide Decision at 3; CMS Magnesium Sulfate Decision at 3; CMS Heparin (NDA 017651) Decision at 3.  CMS further directed that Fresenius Kabi "must report the above referenced [drugs], currently reported as [non-innovator multiple source drugs] as an [single source] or [innovator multiple source drug], as appropriate, effective for the history of the [drug] in the [MDRP] through March 31, 2016."  *Id.*

155.    In response to the two January 4, 2021 letters from CMS addressing heparin sodium injection (NDA 017029), oxytocin injection, and neostigmine methylsulfate injection, Fresenius Kabi sent CMS a letter on February 26, 2021.  Fresenius Kabi reiterated that it has maintained for many years that these products "should be recognized as non-innovator based on the statute" and "as a matter of regulation."  Letter from Fresenius Kabi to CMS at 2 (Feb. 26, 2021).  Fresenius Kabi highlighted that the CMS letters granted Fresenius Kabi relief with an effective date of April 1, 2016, and that Fresenius Kabi "reserves all arguments and rights . . . with respect to Medicaid

---

[28] In the CMS Magnesium Sulfate Decision, CMS provided *two* effective dates, one for each of the two national drug code (NDC) products marketed under NDA 019316.  It provided an effective date of May 23, 2016 for NDC 63323-0642 because that was the date Fresenius Kabi "reports as the purchased product date for the NDC."  *Id.* at 3.  CMS also provided an effective date of April 1, 2016 for NDC 63323-0064, *id.*, which CMS acknowledges was marketed by Fresenius Kabi ***prior to*** April 1, 2016, *id.* ("NDC 63323-0064 was reported as [a non-innovator] drug to the MDR program prior to the Final Rule").  Fresenius Kabi challenges the April 1, 2016 effective date for NDC 63323-0064.

rebates for products approved under these NDAs and their drug classification for any and all prior periods." *Id.* at 2.

156.   Likewise, in response to the June 9, 2021 letter from CMS addressing furosemide injection, Fresenius Kabi again informed CMS that this product "should be recognized as non-innovator based on the statute," and "as a matter of regulation."  Letter from Fresenius Kabi to CMS at 2 (Aug. 6, 2021).  Further, Fresenius Kabi explained that it reserved its rights as to Medicaid rebates not only for the period from April 1, 2016, but also "for any and all prior periods." *Id.*

157.   On August 29, 2021, Fresenius Kabi again informed CMS that the four NDAs addressed in the first three CMS letters should be classified as non-innovator multiple source drugs for the period prior to April 1, 2016.  Fresenius Kabi explained that it would be both inaccurate and inappropriate to not report the same status for prior periods and that "this issue was decided in the case of *STI Pharma, LLC v. Azar*."  Email from Sanjida Chowdhury to CMS RxDRUGPolicy *et al*. (Aug. 29, 2021).

158.   On March 6, 2024, Fresenius Kabi responded to the CMS Heparin (NDA 107651) Decision and CMS Magnesium Sulfate Decision, explaining that heparin sodium injection (NDA 017651) and NDC 63323-0064 for magnesium sulfate should, based on the statute and as a matter of regulation, be classified as a non-innovator multiple source drug for the period prior to April 1, 2016.  Letter from Trevor L. Wear to Cynthia Denemark at 1-2 (Mar. 5, 2024).  Fresenius Kabi again explained that it would be both inaccurate and inappropriate to not report the same status for prior periods and that this issue was decided in the case of *STI Pharma, LLC v. Azar*.  *Id.* at 2.

## COUNT I

**Defendants' Refusal to Classify The Fresenius Kabi Drugs at Issue As Non-Innovator Multiple Source Drugs For The Period Prior To April 1, 2016 Is Not In Accordance With Law and Exceeds Defendants' Statutory Authority.**

159.   Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

160.   CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016 is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

161.   The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action. 5 U.S.C. § 702.  The APA proscribes agency action that is in excess of statutory authority and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

162.   Because the Fresenius Kabi drugs at issue properly qualify as non-innovator multiple source drugs under the plain language of Section 1927, CMS's refusal to classify them as non-innovator multiple source drugs for the periods prior to April 1, 2016 is in excess of statutory authority and "otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

163.   CMS's decisions refusing to classify the Fresenius drugs at issue as non-innovator drugs for the period prior to April 1, 2016 was based solely on the effective date of the Final Rule that CMS adopted under the MDRP.

164.   CMS's analysis here is the same as the analysis rejected in the *STI Pharma* case. CMS has ignored the plain language of the MDRP statute, which existed long before the Final Rule.  The language, structure, and purpose of the MDRP statute confirms that the Fresenius Kabi drugs at issue are non-innovator multiple source drugs because they were not "originally marketed under an ***original*** new drug application approved by" FDA.

165.    *First*, NDA 017029 and NDA 017651 for heparin sodium injection were not "originally marketed under an original new drug application approved by" FDA.  To the contrary, NDA 017029 and NDA 017651 (a) were literature-based applications; (b) sought approval of generic versions of an established drug approved decades earlier and marketed as a branded drug; and (c) were filed in response to a DESI Program determination that (i) concluded that heparin sodium injection was effective for its intended uses, and (ii) directed all companies marketing heparin sodium injection to file NDAs.  There is no reasonable basis for CMS to construe NDA 017029 or NDA 017651 as an original NDA or to construe Fresenius Kabi's heparin sodium injection products as innovator drugs under the pre-2019 version of the MDRP statute for the period prior to April 1, 2016.

166.    *Second*, NDA 018248 for oxytocin injection was not "originally marketed under an original new drug application approved by" FDA.  To the contrary, NDA 018248 (a) contained essentially only labeling and manufacturing information; (b) contained no significant discussion of safety or efficacy (not even a review of published literature); (c) sought approval of a generic version of an established drug that had been marketed without FDA approval for decades; and (d) was filed—simultaneously with multiple other applications—in response to a letter from FDA mandating labeling changes based on Advisory Committee input.  There is no reasonable basis for CMS to construe NDA 018248 as an "original NDA" or to construe Fresenius Kabi's oxytocin injection products as innovator drugs under the pre-2019 version of the MDRP statute for the period prior to April 1, 2016.

167.    *Third*, NDA 018902 for furosemide injection was not "originally marketed under an original new drug application approved by" FDA.  To the contrary, NDA 018902 (a) was a literature-based application submitted under FDA's paper NDA policy; (b) sought approval of a

generic version of a branded product that had been approved roughly ten years earlier; (c) was the

at least the seventh entrant into the furosemide injection market; and (d) was overseen by the

Division of Generic Drugs starting about a month after approval. There is no reasonable basis for

CMS to construe NDA 018902 as an original NDA or to construe Fresenius Kabi's furosemide

injection products as innovator drugs under the pre-2019 version of the MDRP statute for the

period prior to April 1, 2016.

168.    *Fourth*, NDA 019316 for magnesium sulfate injection was not "originally

marketed under an original new drug application approved by" FDA.  To the contrary, NDA

019316 (a) sought approval of a generic drug marketed in the United States before enactment of

the FDCA in 1938 and considered by both FDA and the drug manufacturing industry to be a

grandfathered drug, (b) was a literature-based 505(b)(2) application; and (c) sought FDA's

approval solely to market magnesium sulfate injection in a plastic container.  There is no

reasonable basis for CMS to construe NDA 019316 as an "original" NDA or to construe Fresenius

Kabi's magnesium sulfate injection product as an innovator drug under the pre-2019 version of

the MDRP statute for the period prior to April 1, 2016.

169.    *Finally*, NDA 203629 for neostigmine methylsulfate injection was not "originally

marketed under an original new drug application approved by" FDA.  To the contrary, NDA

203629 (a) was a literature-based 505(b)(2) application; (b) sought approval of a generic version

of a branded drug first marketed in the United States in the 1930s; and (c) sought approval to

market a duplicate of the branded drug, Bloxiverz.  There is no reasonable basis for CMS to

construe NDA 203629 as an original NDA or to construe Fresenius Kabi's neostigmine

methylsulfate injection products as innovator drugs under the pre-2019 version of the MDRP

statute for the period prior to April 1, 2016.

170.    Defendants cannot rely upon the April 1, 2016 effective date of the Final Rule as the basis for denying non-innovator multiple source status to the Fresenius Kabi drugs as issue for the time period prior to April 1, 2016.

171.    Defendants' refusal to rule that these drugs are non-innovator multiple source drugs for the period prior to April 1, 2016 is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

172.    Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## COUNT II

**Defendants' Refusal To Classify The Fresenius Kabi's Drugs At Issue as Non-Innovator Multiple Source Drugs for the Period Prior to April 1, 2016 Is Arbitrary and Capricious.**

173.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs.

174.    CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator drugs for the periods prior to April 1, 2016 is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

175.    The APA allows a person suffering a wrong or adversely affected by an agency action to receive judicial review of the agency's action. *Id.* § 702.  Under the APA, agency action is arbitrary and capricious when the agency acts counter to the evidence in the record or when its action lacks a rational connection to the facts of the record.  *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983); *Haselwander v. McHugh*, 774 F.3d 990, 998-999 (D.C. Cir. 2014).

176.    The administrative record does not support Defendants' refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016.

177.    CMS sought to justify its refusal to classify the drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016 because that is the effective date of CMS's Final Rule.  That analysis is arbitrary and capricious because it fails to address that non-innovator status is warranted under the plain language of the pre-2019 MDRP statute.

178.    CMS's actions are further arbitrary and capricious because they failed to address the analysis of the District Court in *STI Pharma* which rejected the grounds offered by CMS for its refusal to reclassify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016.

179.    In failing to classify the Fresenius Kabi drugs as non-innovator drugs for the period prior to April 1, 2016, CMS took final agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

180.    Defendants' actions in refusing to classify the drugs at issue as non-innovator drugs for the period prior to April 1, 2016 is arbitrary and capricious because their position is internally inconsistent.  When CMS has decided that a drug should be classified as an "innovator" drug, it does not limit that classification to the period after the effective date of the Final Rule.  Instead, CMS applies the innovator classification, and allows the states to recoup rebates at the higher innovator rate, for "***the entire history of the [drug] in the [MDRP]***."  *E.g.*, Letter from Cynthia R. Denemark to C. Elkins at 5-6 (May 9, 2023) (emphasis in the original).  There is no rational basis for CMS's refusal to similarly apply "non-innovator" classifications to the period prior to April 1, 2016 for the Fresenius Kabi drugs at issue.

181.    Fresenius Kabi lacks an adequate remedy at law for Defendants' unlawful action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Declare that CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016, is arbitrary, capricious, and not in accordance with the law or otherwise in excess of the Agency's authority;

B.      Declare that the Fresenius Kabi drugs at issue qualify as non-innovator multiple source drugs for the period prior to April 1, 2016;

C.      Vacate and set aside CMS's refusal to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016;

D.      Remand the matter to CMS to classify the Fresenius Kabi drugs at issue as non-innovator multiple source drugs for the period prior to April 1, 2016;

E.      Enjoin CMS from taking further action to classify or otherwise treat the Fresenius Kabi drugs at issue as innovator drugs; and

H.      Grant such other relief as this Court deems just and proper.

March 8, 2024                                  Respectfully Submitted,

*Paul J. Zidlicky*

Paul J. Zidlicky (No. 450196)
pzidlicky@sidley.com
(Tel.) 202-736-8013
Sean C. Griffin (No. 442284)
sgriffin@sidley.com
(Tel.) 202-736-8107
Brooke E. Boyd (No. 1721284)
brooke.boyd@sidley.com
Kevin A. Sforza (No. 90003884)
ksforza@sidley.com
(Tel.) 202-736-8529
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
(202) 736-8711 (fax)

Trevor L. Wear (*pro hac vice* forthcoming)
twear@sidley.com
(Tel.) 312-853-7101
Rina Mady
rmady@sidley.com (*pro hac vice* forthcoming)
(Tel.) 312-853-6109
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)

*Counsel for Plaintiff Fresenius Kabi USA, LLC*